**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **(1)PATRICK PARKER and** | ) |
| **(2) DENA PARKER** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **VS.** | ) **CIVIL ACTION NO. 2-02CV-18-DF** |
| | ) **JUDGE DAVID FOLSOM** |
| **(1)FORD MOTOR COMPANY, INC.** | ) |
| | ) |
| **Defendant.** | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
<u>**ORDER OF JULY 3, 2003**</u>

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

**NOW COMES**, Plaintiffs Patrick Parker and Dena Parker (hereinafter "Plaintiffs"), and files

this, their Response to Defendant  Ford Motor Company's (hereinafter "Ford") Objections to the

United States Magistrate Judge's July 3, 2003 Order on Plaintiffs' Motion to Compel, and would

respectfully show the Court as follows:

**I.**

<u>**REQUEST FOR HEARING**</u>

The information that Magistrate Judge McKee compelled Ford to produce in this case is

necessary information for the prosecution of Plaintiffs' case.  However, Ford continues to refuse

to produce this important information even though this case is set for trial October 7, 2003.

Therefore, pursuant to Local Rule CV-7(a), the Plaintiffs request a hearing before this Court in an

effort to expedite a resolution of this matter.

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
<u>**ORDER OF JULY 3, 2003**</u>  **- Page 1**



## II.

## BACKGROUND:

Patrick Parker is a quadriplegic as a result of the roof of his 2001 Ford F250 pickup truck collapsing in on him when the vehicle rolled over. The Parkers have alleged and believe that Ford was negligent, and that the 2001 Ford F250 pickup truck was a defective product due to the failure of Ford to design and/or build the 2001 Ford F250 pickup truck with a stronger roof. In an effort to prove these allegations, Plaintiffs sought information that was in Ford's control, in particular, information about safer alternative designs and information about similar defects. Ford refused to produce such information. As a result, on April 23, 2003, Plaintiffs filed its Motion to Compel Ford to produce those documents, as well as other documents that Ford had agreed to produce, but had not yet produced.

Plaintiffs' Motion to Compel was referred to United States Magistrate Judge, Harry W. McKee by this Honorable Court. Originally, Judge McKee granted Plaintiffs' Motion to Compel on May 15, 2003 because Defendant had failed to timely file its response. However, because Plaintiffs had received a copy of the response in a timely manner, Plaintiffs agreed to Defendant Ford Motor Company's motion to vacate that Order. Unfortunately, the merits of Plaintiffs' Motion to Compel were not heard by a United States Magistrate Judge until July 1, 2003, at which time the Judge granted Plaintiffs' Motion. The Judge entered his Order on July 3, 2003.

Pursuant to the Court's Order, Ford was to produce documents by July 21, 2003. However, on July 18, 2003, Ford filed with the Court its objections to the United States Magistrate Judge's

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S
OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE
ORDER OF JULY 3, 2003 - Page 2**

Order. With approximately two (2) months left to trial in this case, Ford is still refusing to produce relevant and material information that would allow Plaintiffs to prove their allegations.

## III.

## SUMMARY OF ARGUMENTS

Ford has admitted that the roof structure of the 2001 F250 pickup truck, which Patrick Parker was driving at the time he suffered his devastating injuries was designed to meet a minimal standard. In particular, the roof structure was designed so that it would intrude into the passenger's compartment not more than 5 inches when subjected to a load in one specified direction that was equal to 1 and 1/2 times its maximum unloaded vehicle weight. Indeed, this is the same minimal performance standard that Ford uses to design the roof structures on almost all of its vehicles. It is Plaintiffs' contention that that minimal design standard is ineffective in real world rollover accidents and that therefore, the Ford F250 pickup truck at issue was defectively designed.

In an effort to show that this minimum design performance criteria is ineffective in real world rollover accidents, Plaintiffs seek two (2) very specific types of evidence. First, Plaintiffs seek information regarding other accidents involving similar defects. In other words, Plaintiffs are seeking information regarding other accidents where people were injured as a result of roof intrusion where the vehicles involved were designed using the same minimal performance design criteria, i.e., 1 and 1/2 times maximum unloaded vehicle weight. As the 5th Circuit has stated numerous times, the "substantially similar" predicate for the proof of similar accidents is defined by the defect at issue. Jackson vs. Firestone Tire & Rubber Co., 788 F.2d 1070, 1083 (5th Cir. 1986).

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S
OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE
ORDER OF JULY 3, 2003** - Page 3

Secondly, Plaintiffs seek information with respect to another vehicle manufactured by Ford known as the Volvo XC90. According to advertisement claims, Ford has designed the Volvo XC90 to a performance standard that is 100 times greater than the 1 and 1/2 times maximum unloaded vehicle weight standard that Ford uses in its other products. Indeed, Hans Wickman, an agent of Ford, has stated that the roof structure for the Volvo XC90 is designed so that it will intrude into the passenger compartment less than two inches in virtually any rollover. Plaintiffs believe that such evidence is relevant to demonstrate the safer alternative design.

In addition to these two key areas of information, Plaintiffs also seek information that even Ford agrees is relevant; namely, the finite element model for the subject vehicle. Ford has admitted that it did not conduct any physical test on the roof structure for the 2001 Ford F250 pickup truck. Rather, Ford created a computer model of the subject roof, known as a finite element model, and subjected it to computer simulated tests, known as finite element analysis. Ford has not produced any relevant finite element analysis[1], nor has it produced the finite element model, claiming, that they are unable to locate such information. Plaintiffs merely want to know how "diligent" Ford's search for these items has really been.

---

[1]     Ford has produced three finite element analyses that were conducted on roof design concepts in the very early design stage. No finite element analyses were provided of the final design or of the design changes made after initial production.

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE ORDER OF JULY 3, 2003  - Page 4**

## IV.

## ARGUMENTS AND AUTHORITIES

### A.    Standard of Review

A district judge shall modify or set aside a magistrate judge's order only when he finds the order to be "clearly erroneous or contrary to law." Federal Rule of Civil Procedure 72(a). See also, Heuser v. Johnson, 189 F. Supp. 2d, 1250, 1257 (D.N.M. 2001). In other words, this Court should set aside or modify Magistrate Judge Harry W. McKee's Order only if it is shown to be clearly erroneous.

In determining whether United States Magistrate Judge Harry W. McKee's Order is clearly erroneous, the Court should bear in mind that "relevance" in a discovery sense is much broader than "relevance" at trial. Indeed, discoverable information need not be admissible at trial if it "appears reasonably calculated to lead to the discovery of admissible evidence." Federal Rule of Civil Procedure 26(b)(1). "Relevance" is interpreted to included "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." Coughlin vs. Lee, 946 F.2d 1152, 1159 (5th Cir. 1991). As will be shown, the United States Magistrate Judge Harry W. McKee's Order is not clearly erroneous because the discovery he has ordered bears on or reasonably could lead to other matters that could bear on issues that are in this case.

### B.    Evidence of Other Accidents Involving Similar Defect is Relevant

When Ford designed the 2001 F250 pickup truck roof structure, it designed the roof structure to meet a minimal performance criteria - - 1 and 1/2 times maximum unloaded vehicle weight.

Indeed, this is the same performance criteria that Ford uses to design the roof structures for almost all of its vehicles . Plaintiffs believe, and will prove, that such performance criteria is insufficient in real world rollover accidents and, therefore, it is defective and unreasonably dangerous. So that Plaintiffs could prove that such performance criteria was ineffective in real world rollover crashes, United States Magistrate Judge Harry W. McKee ordered Ford to produce any and all claims information where the allegations involved serious injury or death, as a result of roof crush for any Ford vehicle, model years 1991 through 2001. Ford does not want to produce this information, claiming that such information is irrelevant.

The 5th Circuit has long held that the predicate for proof of similar accident in a products liability claim is defined by the defect at issue. Jackson vs. Firestone Tire & Rubber Co., 788 F.2d 1070, 1083 (5th Cir. 1986); Mitchell vs. Fruehauf Corp., 568 F.2d 1139, 1147 (5th Cir. 1978). In Jackson, the case involved a multi-piece wheel rim which exploded causing injury to the plaintiff. Apparently, the plaintiff had mismatched a Firestone five degree rim base with a Goodyear side ring which resulted in an unreasonably dangerous mismatch. In overruling the Trial Court's exclusion of evidence of other accidents involving mismatches of other types of multi-piece tire rims, the Court noted:

> "The problem is that the magnitude of the danger of the multi-piece rims cannot be proved when the experience with those rims is limited to cases in which an LW ring was put together with a 5 degree base. ... If the disputed defect were restricted to the mismatch of these two parts, then the trial court's ruling would have been correct. But if that defect is the danger of all multi-piece parts because of the great risk of poor fit, then some proof of other accidents involving multi-piece rims is admissible on the issue of the magnitude of the danger." [citations omitted]

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
<u>**ORDER OF JULY 3, 2003**</u> **- Page 6**

788 F.2d at 983. See also, Mitchell v. Fruehauf Corp., 568 F.2d 1139, 1147 (5th cir. 1978) (Holding that evidence of other accidents involving other type trailers of hanging meat is admissible because the design defect was the lack of restraints to prevent the hanging meat from swinging, and the resulting lack of stability.)

Here, the defect is the ineffective performance criteria. Therefore the other accidents involving vehicles that use the same performance criteria are relevant to show poor performance in real world accidents. Likewise, the magnitude of the danger of the minimum performance criteria that Ford uses when designing the roof structures of its vehicles cannot be appreciated when the experience is limited to Ford F250 pickup trucks, or to Ford trucks in general. It is one thing to show that there have been 10, 15, or even 100 deaths or serious injuries as a result of excessive roof intrusion in a rollover accident, but it is quite another to show that Ford has had 3,400 lawsuits as the result of excessive roof intrusion.[2]

By way of analogy, let's suppose that in the Land of Oz, all bridges are designed to hold up a load of 10,000 pounds. So all across the land, the performance criteria that engineers use in designing their bridges is 10,000 pounds. Now the engineers will use different designs, there may be arched bridges, there may be cable bridges, there may just be simple flat cement bridges, but they are all designed to meet a certain performance criteria; 10,000 pounds. In fact, the bridges may be of different lengths; some may span a simple ditch, while others may span great lakes or rivers, but they

---

[2]     Attached to Ford's objections is an affidavit of Timothy Quinlan, a Ford corporate lawyer. Mr. Quinlan testified that he has identified 3,400 claims and lawsuits where injury or death occurred from roof crush of Ford vehicles model years 1991 through 2001.

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
**ORDER OF JULY 3, 2003** - Page 7

are all designed to meet a certain specified performance criteria, i.e., 10,000 pounds. But many of the bridges collapse when subjected to real world loads. If an engineer is hired to determine the effectiveness of the performance criteria used to design the bridges, would that engineer only be limited to the arched bridges, or would he be allowed to look the reasons for the collapse of all the bridges, including the cable bridges and the flat bridges? Would that engineer be limited to the collapse of bridges that only spanned a ditch or would he be allowed to look at not only the bridges that collapsed that spanned the ditch, but spanned the rivers and the lakes as well? Obviously, in that scenario, it would be ludicrous to limit the engineer to a specific type of design or specific span link of the bridge.

But in essence, that is what Ford is asking this Court to do in this case, is limit Plaintiffs in proving that the performance criteria that Ford uses is ineffective in real world rollover accidents. Even Ford's own engineers have agreed that if someone was going to conduct a study to determine the effectiveness of the 1 and 1/2 times maximum unloaded vehicle weight standard, then you would need to look at all the roof crush cases for all the vehicles involved, not just for the pickup trucks.[3]

A case similar to this one is Ramos v. Liberty Mut. Ins. Co., 615 F. 2d 334 (1980). In that case a manufacture had designed two oil rig derricks in a similar manner but with significantly different rated capacities. Nevertheless, both derricks failed in a similar fashion, both at loads below their rated capacity. The Court of Appeals held that the evidence of the first collapse could be introduced into the trial regarding the second collapse even though they had different rated capacities.

---

[3]  See testimony of Bruno Barthelemy, p. 127, l. 5-12, attached to Plaintiffs' Motion to Compel as Exhibit "H".

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE ORDER OF JULY 3, 2003 - Page 8**

The court reasoned that such evidence was admissible to prove Defendant's notice of defect, the derrick's safety under foreseeable conditions, the strength of the derrick and most especially causation.

In this case, evidence of other roof crush cases is relevant for the same reason. Although Ford's vehicles are designed to different roof strengths, they are designed to a similar performance criteria - 1 ½ times maximum unloaded vehicle weight. Furthermore, the injuries occurred in similar manners - excessive roof crush into the passenger compartment in a rollover accident. Therefore, evidence of other accidents is relevant to show not only notice to Ford of the ineffectiveness of its performance criteria - and not only the magnitude of the danger of the performance criteria - but demonstrates the safety (or lack thereof) of the performance criteria under foreseeable (real world) conditions.

Although when arguing the issues in front of Judge McKee, Ford was merely taking the position that such claims were irrelevant, Ford now, for the first time, wants to claim that to produce such information would be unduly burdensome. Such new evidence should not be considered by this Court. Because Ford failed to produce such evidence or raise such issues before Judge McKee, Ford has waived that issue.

Nevertheless, the disingenuousness of the Affidavit of Timothy Quinlan should be pointed out. Ford has searched for and identified 3,400 lawsuits and claims where injury or death allegedly occurred as a result of roof crush of Ford vehicles, model years 1991 through 2001. Under Judge McKee's Order, Ford would be required to provide copies of the petition, police reports, and non-

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
**ORDER OF JULY 3, 2003** - Page 9

litigated claim information.  Therefore, Ford would have to go to those files, pull those three or four documents, copy them, and then send them to Plaintiffs.

But then Mr. Quinlan makes an untenable leap of logic.  Mr. Quinlan analogizes to a recent case where Ford conducted a review of 1,064 lawsuits and claim files to provide responses to Plaintiffs' Request for Admissions which he claims took approximately 1,000 hours.  He then concludes because this case involves 3,400 lawsuits, that it will take 3,000 hours to do the similar thing.  But Plaintiffs are not asking Ford to review the documents, analyze them, and then respond to questions based upon their analysis of the documents in this case.  Rather, Plaintiffs are merely asking Ford to copy the documents and send them to the Plaintiffs, an act that would take considerably less time than reading and analyzing the documents.  Mr. Quinlan is comparing apples to oranges.

Ford has failed to demonstrate that United States Magistrate Judge Harry W. McKee's Order is clearly erroneous  in ordering Ford to produce claims information for other roof crush claims for model years 1991 through 2001.  Indeed, such information is relevant to show proof of defect, i.e., that the performance criteria that Ford uses in designing roof structure integrity in Ford's vehicles is insufficient in real world rollover accidents.  Therefore, Ford's objection to Judge McKee's Order on that issue should be overruled.

###　C.　　The Volvo XC90 is Relevant to Show Safer Alternative Design

It is undisputed that in this case, the Plaintiffs must show that (1) there was a safer alternative design; (2) that the safer alternative design would have prevented or significantly reduced the risk of injury, without substantially impairing the products utility; and (3) the safer alternative design was

both technologically and economically feasible when the product left the control of the manufacturer. Smith vs. Aqua Flow, Inc., 23 S.W.3d, 473 (Tex. App. - - Houston {14th] Dist. 2000, Pet. den'd). Thus, Plaintiffs must show that there was a safer alternative design that would have prevented or significantly reduced the risk of injury to Patrick Parker without substantially impairing the products utility that was both technologically and economically feasible in 2001, the year that this particular product left the control of Ford Motor Company.

The Texas Supreme Court, in the case of Boatland of Houston, Inc. vs. Bailey, 609 S.W.2d 743 (Tex. 1980), in explaining what evidence is admissible to show safer alternative design, declared that:

> "A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use **or was available at the time of manufacture**. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative. Thus, evidence of the actual use of, **or capacity to use**, safer alternatives is relevant insofar as it depicts the available scientific knowledge and the practicalities of applying that knowledge to a product's design."

Id. at 746. *Emphasis added.*   Thus, feasibility of safer alternative design can be shown, by not only actual use, but by the capacity to use such a design when the product at issue was manufactured.[4] In this case, Plaintiffs may show feasibility of safer alternative design by showing that Ford, in 2001, when this product was manufactured, had the capacity to use safer alternative designs.

The Volvo XC90 is evidence of a safer alternative design.  Advertising statements claim that the Volvo XC90 roof structure is designed to a performance criteria that is 100 percent greater than

---

[4]      In Boatland of Houston, Inc. v. Bailey, the Court allowed evidence of a "Quick Kill" device that was on boats at the time of trial even though such devices were not being used when the boat in question was manufactured.

the performance criteria that Ford uses when designing its other vehicles, i.e., 1 and ½ times maximum unloaded vehicle weight. Furthermore, in advertising statements, it has been claimed that the Volvo XC90 roof structure will intrude into the passenger compartment less than 2 inches in virtually any rollover. By contrast, Ford engineers have agreed that the Ford F250 will have roof intrusion into the passenger's compartment greater than 2 inches in virtually every rollover.

Likewise, when the XC90 roof structure was tested, at least four different test criteria were used: Dolly rollover test, a drop test, a static roof crush test, as well as computer simulations were all different types of tests used to determine the structural integrity of the roof structure for the XC90. By contrast, when Ford developed the 2001 Ford F250 at issue, it did no physical testing and only used minimal computer simulations to determine the structural integrity of that roof structure.

Ford claims that because the Volvo XC90 was not introduced into the marketplace until the latter part of 2002, and the early part of 2003, that, therefore, such evidence is irrelevant for this 2001 Ford F250 pickup truck. But the design, development and testing of the roof structure for the XC90 occurred long before the product was introduced into the marketplace in late 2002 and early 2003. Indeed, design development and testing of a new vehicle generally predates introduction of the product by 5 years. Therefore, this evidence would be relevant to show that Ford had the capacity to use those design criterias when it manufactured the 2001 Ford F250 pickup truck.

Evidence of the design, development and testing of the Volvo XC90 roof structure would be relevant to the issue of safer alternative design regardless of whether Ford Motor Company owned Volvo or not. The fact that Ford now owns Volvo only means that Ford is "in control" of the XC90 documents that the Court has ordered Ford to produce. Gerling Intern. Inc. Co. vs. C.I.R., 839 F.2d

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
**ORDER OF JULY 3, 2003 - Page 12**

131, 140 (3rd Cir. 1988). Therefore, the fact that the design and development of the F250 truck at issue occurred before 1999 is irrelevant as to whether or not the Volvo XC90 documents demonstrates safer alternative design.[5] But what is important is the fact that in 2001, when the pickup truck at issue was manufactured that allowed unreasonable roof intrusion in rollover accidents, another Ford Motor Company subsidiary was designing, developing and testing a roof structure that would provide minimal intrusion into the passenger compartment in virtually any rollover accident.

Clearly, United States Magistrate Judge Harry W. McKee was not in error when he ordered Ford Motor Company to produce the documents for the Volvo XC90. Such documents are in Ford's "control" and they are relevant to show safer alternative design. In particular, they are relevant to show that in 2001, when the vehicle at issue was manufactured, Ford had the capacity to design a safer roof.

### D.   Plaintiffs Should be Allowed Discovery as to What Type of Search Ford has Conducted for Relevant Information

An important piece of evidence in this case is the finite element model for the subject vehicle. The finite element model is a computer model that is used to conduct computer simulated tests. In particular, Ford has admitted that it conducts no physical test to determine the structural integrity of the roof for the F250 pickup truck at issue. It merely conducted the computer simulated test using the finite element model for the subject vehicle.

---

[5]   Ford argues to great extent that this vehicle was designed before 1999. But for purposes of proving whether the product was defectively designed, you must look at the state of the knowledge available when the product was manufactured. Ford manufactured the product in 2001.

Indeed, Ford allegedly has conducted numerous finite element analysis using the finite element model. Allegedly, they conducted such finite element analysis using the finite element model in 1996, and 1999. However, Ford has not produced the finite element model, nor has it produced any of the finite element analysis that it has conducted after the final production design. Ford claims that it has searched for such information, but cannot find such information.

United States Magistrate Judge Harry W. McKee ordered Ford to provide to Plaintiffs' counsel an Affidavit with respect to its search for any finite element analysis reports regarding the roof structure for the P131 platform and finite element models for the subject platform. Ford did produce such affidavit which is attached hereto as Exhibit "A". In that affidavit, Ford's representative claims that it has searched for finite element analysis and has found none. However, Ford has failed to mention that it cannot find the finite element models for the subject platform. This defect in the Affidavit was brought to the attention of Ford's counsel. See Exhibit "B". However, to date, Ford has failed to amend the Affidavit at issue.

The finite element model is useful to Plaintiffs for many reasons. First, the finite element model can be used to confirm the alleged results obtained by Ford Motor Company in its finite element analysis. Secondly, the finite element model provides useful information with respect to the design of the roof structure, that cannot be obtained elsewhere. Lastly, and probably most importantly, the finite element model can be used and modified by Plaintiffs' experts to show that a safer alternative design was not only reasonable, and both technologically and economically feasible, but that such design would significantly reduce the risk of injuries in this case. Ford understands the usefulness of the finite element model for Plaintiffs improving their case against Ford.

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S**
**OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE**
**ORDER OF JULY 3, 2003** - Page 14

Plaintiffs should be allowed to take the depositions of the corporate representative of Ford Motor Company to determine what search Ford has conducted to find the finite element model. It doesn't matter who has conducted the search, whether that person is an attorney, or under the control of an attorney, or simply a Ford engineer. The fact is that some type of search is being conducted, and Plaintiff should be able to ask questions of that person to determine if the search is actually a "diligent" search.

For the finite element model to be useful to Plaintiffs and to Plaintiffs' expert, some lead time would be necessary. The fact that Ford claims that it has "searched" for the finite element model but has been unable to locate such a model, but is continuing to search, leaves the door open for Ford to suddenly "find" the finite element model on the eve of trial or, more likely, after the Plaintiff has put on its case in chief but right before Ford begins its case in chief.

What search Ford has done to find this elusive finite element model is not subject to the attorney work product doctrine. The attorney work product doctrine is designed to protect the attorney's mental impressions and opinions with respect to strategy of a case. It is difficult to fathom how the method of a search for an important piece of evidence would reflect an attorney's mental impressions about a particular case. Certainly, Ford may have avoided such a deposition by providing much more detail in the Affidavit. Not only has Ford provided a vague and conclusory affidavit, it has failed to address the major issue, where the finite element model is. Clearly, United States Magistrate Judge Harry W. McKee's Order is not clearly erroneous for allowing Plaintiffs to take a 30(b)(6) deposition on what search, if any, Ford has conducted to find the elusive finite element model.

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S
OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE
<u>ORDER OF JULY 3, 2003</u> - Page 15**

## V.

## CONCLUSION

Ford Motor Company's objections to United States Magistrate Judge Harry W. McKee's July 3, 2003 Order on Plaintiffs' Motion to Compel should be overruled. Defendant Ford Motor Company has failed to demonstrate to this Court that Magistrate Judge McKee's Order is clearly erroneous. On the contrary, such evidence is very relevant to the issues in this case. This is just another example of Ford attempting to delay providing very relevant and important information to Plaintiffs.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request that this Court overrule Ford Motor Company's objections to the July 3, 2003 Order, and for such other and further relief, both at law and in equity, to which they may show themselves justly entitled.

Respectfully submitted,

**THE LAW OFFICES OF**
**FRANK L. BRANSON, P.C.**

Frank L. Branson
State Bar No. 02899000
J. Gregory Marks
State Bar No. 12994900
Highland Park Place
4514 Cole Avenue, 18th Floor
Dallas, Texas 75205
(214) 522-0200
(214) 521-5485 Fax

**ATTORNEYS FOR PLAINTIFFS**
**PATRICK PARKER AND DENA PARKER**

***

## CERTIFICATE OF SERVICE

On this the __25th__ day of July, 2003, a true and correct copy of the above and foregoing instrument was mailed via certified mail, return receipt requested to Ford Motor Company, Inc. by and through its attorney of record, Rickey L. Faulkner, Esq., Brown McCarroll, L.L.P., Post Office Box 3999, Longview, Texas 75606-3999 and Patrick X. Fowler, Esq., Snell & Wilmer, L.L.P., One Arizona Center, 400 East Van Buren, Phoenix, Arizona 85004-2202.

_____
J. Gregory Marks

**PLAINTIFFS' RESPONSE TO DEFENDANT FORD MOTOR COMPANY'S
OBJECTIONS TO UNITED STATES MAGISTRATE JUDGE
<u>ORDER OF JULY 3, 2003</u>  - Page 17**

Exhibit "A"

# AFFIDAVIT OF THOMAS F. PATTERSON, JR.

STATE OF MICHIGAN      )
                       )
COUNTY OF WAYNE        )

I, Thomas F. Patterson, Jr., being duly sworn, state as follows:

1. I have been employed by Ford Motor Company ("Ford") for 37 years, all of which have been related to vehicle engineering. My present position is Design Analysis Engineer.

2. I submit this affidavit in response to the Magistrate's Recommendations of 7/30/03 in Parker v. Ford. By making this affidavit, I do not intend to waive, nor have I been authorized to waive, any attorney-client privilege or attorney work-product protection.

3. As a result of my experience in Body Engineering and my present position as a Design Analysis Engineer, I have conducted searches for documents and materials requested by Plaintiffs in this lawsuit. I have searched for requested materials in those areas where the materials could be expected to be found.

4. As of the time of this affidavit, and despite a reasonable inquiry and diligent search, Ford has been unable to locate the requested Finite Element Analysis ("FEA") for the roof structure of the PHN-131. I will continue to search for the FEA and it is my understanding that Ford will produce the FEA if it is located.

Further affiant sayeth naught.

THOMAS F. PATTERSON, JR.
J.P.

WITNESS my hand at office this 8th day of July, 2003.

FRANCES MARY KLEABIR
NOTARY PUBLIC
WAYNE COUNTY MICHIGAN
COMMISSION EXPIRES: 12-17-2006

Frances Mary Kleabir
Notary Public
Wayne County
State of Michigan

My Commission Expires on 12/17/06

**Exhibit "B"**

THE LAW OFFICES OF

## FRANK L. BRANSON, P.C.

FRANK L. BRANSON
DEBBIE DUDLEY BRANSON
THOMAS J. FARMER*
MICHAEL G. GUAJARDO
QUENTIN D. BROGDON*
J. GREG MARKS*
C. MICHAEL CLARK**

18TH FLOOR
HIGHLAND PARK PLACE
4514 COLE AVENUE
DALLAS, TEXAS 75205-4185

214-522-0200
D/FW METRO: 972-263-7452
FAX: 214-521-5485

OF COUNSEL

TED Z. ROBERTSON
J. HADLEY EDGAR, JR.

*BOARD CERTIFIED IN
PERSONAL INJURY TRIAL LAW

**BOARD CERTIFIED IN
CIVIL APPELLATE LAW

July 10, 2003

**VIA FAX NO. (602) 382-6070**
Jeffrey C. Warren, Esq.
Snell & Wilmer
One Arizona Center
Phoenix, Arizona 85004-2202

Re:   <u>Parker v. Ford Motor Company</u>

Dear Mr. Warren:

I received your facsimile yesterday enclosing a copy of an affidavit from Thomas F. Patterson, Jr.

Please be advised that my reading of the affidavit indicates that it is incomplete. While Mr. Patterson comments with respect to his search for finite element analysis, he omits any reference to searching for, or locating, the finite element model for the PHN-131. Therefore, pursuant to the Court's Order of July 3, 2003, we would request that Ford make available a corporate representative with the most knowledge with respect to the search for the finite element model, as well as the finite element analysis. We would like to take that deposition during the first full week of August.

In addition, you indicated that the CAD drawings were not yet available. I would expect that all CAD drawings could be available by July 15, 2003. It is my understanding that the search for corporate minutes is still ongoing. Again, I would expect that these documents could be produced by July 15, 2003.

I'm still awaiting the conference call to discuss the "No Boundaries" advertising campaign information. Also, I'm still awaiting the information about the weld pattern specifications.

Thank you for your attention to this matter.  I look forward to hearing from you in the near future.

Sincerely,

J. Gregory Marks

JGM:mag

```
*************************************************************************
*.       · Case 2:02-cv-00182-DF  Document 30  Filed 07/28/03  Page 24 of 24 PageID #:  160  P.01  *
*                            TRANSACTION REPORT                              *
*                    ─────────────────────────                             *
*                                              JUL-10-03 THU 04:45 PM        *
*                                                                            *
*    DATE  START    RECEIVER        TX TIME   PAGES TYPE      NOTE      M#  DP *
*  ─────────────────────────────────────────────────────────────────────── *
*    JUL-10 04:44 PM 16023836070       52″     3  SEND       OK         314  *
*  ─────────────────────────────────────────────────────────────────────── *
*                                                                            *
*                                      TOTAL :      52S PAGES:   3           *
*                                                                            *
*************************************************************************
```

THE LAW OFFICES OF

# FRANK L. BRANSON, P.C.
### 18TH FLOOR
### HIGHLAND PARK PLACE
### 4514 COLE AVENUE
### DALLAS, TEXAS 75205-4185

**214-522-0200**
**D/FW METRO: 972-263-7452**
**FAX: 214-521-5485**

## FAX COVER SHEET

July 10, 2003

To:        Jeffrey C. Warren, Esq.

Of:        Snell & Wilmer

Fax Number:  (602) 383-6070

From:      J. Gregory Marks, Esq.

RE:        Parker v. Ford 020115